**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                          No. CR 03-2274 JB

JOHN GOULD and
VIOLET GOULD,

        Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Violet Gould's Motion in Limine

Regarding Statements of Kristi Chamberline [sic], filed February 27, 2007 (Doc. 241)("Motion").

The Court held a hearing on the motion on March 8, 2007.  The primary issues are whether the Court

should exclude: (i) Kristi Chamberlain's testimony regarding the training that she and others

received at the Cibola County Detention Center ("CCDC") regarding use of force policies, including

training related to the use of pepper spray and the FN303; and (ii) Chamberlain's testimony

regarding observations, assessments, and knowledge of the wounds and care that James Barber

received at CCDC in the days after he was shot several times with the FN303.  Because decisions

from the United States Court of Appeals for the Tenth Circuit indicate that Chamberlain's

anticipated testimony about policies would be irrelevant evidence, the Court will exclude her

testimony about policies, standards, and training to show that co-Defendant John Gould violated

Barber's civil rights.  On the other hand, Chamberlain's testimony about her training may be relevant

to show what Mr. Gould's and co-Defendant Violet Gould's knowledge was and, to that limited

extent, the Court will admit such testimony if it is needed for that limited purpose.  Because the

Court is admitting that testimony to show their state of mind and knowledge, the evidence is admissible for that purpose only if the United States can show that there is a connection between Chamberlain's training and the Goulds' training.  The Defendants will be allowed to submit a limiting instruction that the testimony may  be used only to establish Mr. and Ms. Goulds' knowledge and not to show that Mr. Gould violated Barber's civil rights.  Further, such testimony may not be considered for the truth of the matter asserted.  The Court will allow Chamberlain's observations, assessments, and knowledge of the wounds and care that Barber received at CCDC in the days after he was shot several times with the FN303 to be introduced.  She must not offer opinions or speculations about what others did or did not do, but may testify about what she observed and knew.  To that limited extent, and only to that extent, the Court believes that Chamberlain's testimony may be relevant to the charges that Mr. Gould violated civil rights under color of law in contravention of 18 U.S.C. § 242, and that Ms. Gould obstructed justice in violation of 18 U.S.C. § 1512(b)(3).  Accordingly, the Court will grant in part and deny in part the motion to exclude Chamberlain's testimony.

## **FACTUAL BACKGROUND**

While the Court can give some guidance to assist counsel in preparation for trial, some of the issues will have to wait for trial and will require a question-by-question analysis.  In large part, however, Chamberlain is a fact witness and is free to testify about her observations.  On the other hand, the Court will not permit her to use the CCDC's policies and standards as benchmarks by which to judge the Goulds' conduct.

1.      **Chamberlain's Background.**

The CCDC entered into a contract with Chamberlain, acting as an independent contractor, to provide services at the CCDC as a nurse's assistant medical technician.  See Motion at 6; Government's Response to Defendant Violet Gould's Motion in Limine Regarding Statements of Kristi Chamberlain at 2, filed February 5, 2007 (Doc. 248)("Response").  The United States represents that, as a certified nursing assistant, her duties included administering medication, examining patients to describe their objective condition, assessing patients for information that should be related to physicians, and creating care plans for patients.  See Response at 2. Chamberlain was not, the United States asserts, empowered to prescribe medication or diagnose illnesses, but was trained and authorized to assess patients' symptoms.  See id.

The United States submits that, in addition to her medical technician training, Chamberlain participated in academy training with correctional officer cadets that taught basic jail policies, including use of force policies.  See id.  The United States asserts that, while attending such, she was taught and learned use-of-force policies at every level, including tactics and policies relevant to high-risk situations, cell extractions, and the use of weapons, including the use of pepper spray and the FN303.  See id.

2.      **The Shooting of Barber.**

The United States contends that FN303 Less Lethal Launcher is a riot control weapon which fires, via compressed air, a .68 caliber plastic projectile under 580 pounds per square inch of pressure resulting in a muzzle velocity of 280-300 feet per second.  See id. at 1, n.1.  The FN303's maximum effective range is approximately 163 feet.  See id.  At the time Mr. Gould shot Barber with an FN303, Chamberlain was employed as a nurse's assistant medical technician at the CCDC.  See id.

at 2.

The United States asserts that, on March 22, 2003, Barber was alone in a secure cell where he was naked and kicking on a cell door, and that Chamberlain had been called in from home to examine Barber, who had been brought to the facility by the Milan Police Department, because of a cut on his head.  See id.  The United States represents that Barber refused to allow Chamberlain to examine him, and, instead, demanded to see a doctor and persisted in kicking the cell door with his bare foot.  See id.  According to the United States, Chamberlain's concern over Barber's foot prompted her to contact Mr. and Ms. Gould, who eventually responded to the jail.  See id.  The United States submits that Chamberlain was present throughout the entire interaction between Barber and the Goulds, including the shooting.  See id.

### 3.    Ms. Gould's Statements to New Mexico State Police Concerning Mr. Gould's Shooting of the FN303.

The United States and Ms. Gould agree that the case against her centers on six specific statements she made to the New Mexico State Police.  Ms. Gould anticipates that the United States will seek to offer at trial these statements, which are:

1.    [Ms. Gould] "reported that the reason that John [Gould] shot the FN303 was because there was not enough detention officers present to do a cell extraction."  Grand Jury transcript at 48.

2.    [Ms. Gould] "told the New Mexico State Police, . . . 'I'm not familiar with the weapons they use.'"  Id.

3.    [Ms. Gould] "told the New Mexico State Police that John Gould was trained in the FN303, but not in cell extractions."  Id. at 49.

4.    [Ms. Gould] "told the New Mexico State [Police] that John [Gould] gave clear commands for Mr. Barber to get down before and after he fired the FN303. . . ."  Id.

5.      [Ms. Gould] "told the New Mexico State Police that she cleaned Mr. Barber's bleeding wound on his thigh and an open wound on Mr. Barber's wrist with gauze the night of the incident before she went home." Id. at 49-50.

6.      [Ms. Gould] "told New Mexico State Police about the phone call she had with Rick Lucero.  Rick Lucero called her that evening after she and John went home, and she told the New Mexico State Police, 'Rick Lucero did call one time during the night.  He said that he was still complaining that he was hit in the testicle.  I asked him, is his testicle swollen?  He – meaning Rick Lucero – said, no, everything looks fine.  There's no swelling.  There's no bleeding.'" Id. at 50-51.

Motion at 2-3.

## 4.      **Chamberlain's Anticipated Testimony Regarding the FN303 and Pepper Spray.**

Ms. Gould anticipates that the United States will attempt to introduce the following statements by Chamberlain at trial: (i) opinions about the FN303, including when it should be used, how it should be used, the accuracy of the FN303, how many rounds are required to subdue an inmate, and whether it was appropriate for Mr. Gould to use it against Barber; (ii) opinions about the use of pepper spray, including a comparison of pepper spray to the FN303; and (iii) hearsay statements of Joseph Garcia regarding pepper spray and the FN303. See id. at 4.

## 5.      **Chamberlain's Anticipated Testimony Regarding the Medical Treatment Provided to Barber After the Shooting.**

Ms. Gould anticipates that the United States will seek to introduce at trial statements by Chamberlain concerning: (i) opinions about the etiology of the wounds appearing on Barber's body on March 31, 2002; (ii) speculation about what Barber's body might have looked like days earlier; (iii) opinions regarding whether bacteria had infected Barber's wounds; (iv) opinions relating to whether outside medical assistance should have been sought; (v) opinions about the medical adequacy and medical appropriateness of the treatment Barber received; (vi) opinions as to the

treatment Barber received when Chamberlain was not at work or when she was treating other inmates in other locations within the detention center; (vii) opinions regarding the nature and extent of the treatment Ms. Gould administered to Barber when Chamberlain was not at work or when she was treating other inmates in other locations within the detention center; and (viii) opinions about whether Barber was given an opportunity to comply with Mr. Gould's commands before Mr. Gould shot him with the FN303.  See id. at 5.

## PROCEDURAL BACKGROUND

On August 25, 2004, the grand jury returned the Second Superceding Indictment, charging Ms. Gould with violating 18 U.S.C. § 1512(b)(3).  See Second Superceding Indictment, filed August 25, 2004 (Doc. 91)("Indictment").  Count V of the Second Superseding Indictment alleges that, on or about April 14, 2004, in violation of § 1512(b)(3), Ms. Gould

> did knowingly engage in misleading conduct toward other persons with intent to hinder, delay or prevent the communication to a federal law enforcement officer or federal judge of information relating to the commission or possible commission of a federal offense, to wit:
>
> The defendant made false statements to the New Mexico State Police concerning the March 22, 2004, use of force against James Barber by John Gould, and concerning the medical treatment provided to James Barber following the use of force.  Defendant made these false statements with intent thereby to hinder, delay or prevent the communication of information to any federal law enforcement officer or federal judge about the unjustified use of force against James Barber and the medical treatment provided to James Barber following the unjustified use of force.

Indictment at 4-5.  This charge is the sole one involving Ms. Gould that is included in the Second Superceding Indictment.  See Indictment.

On February 27, 2007, Ms. Gould filed this motion in limine, requesting that the Court issue an order barring Chamberlain's anticipated testimony, because, Ms. Gould contends, Chamberlain's

statements are inadmissible because they are either irrelevant, she is not qualified to make them, they are unexcepted hearsay, or they are speculative.  See id. at 1, 4-5, 6-7.

## EXPERT AND LAY TESTIMONY AND OPINION REGARDING THE USE OF FORCE

While the Court has in the past indicated in other cases that some standard-operating procedures and guidelines could be, with an appropriate limiting instruction, useful to a jury in determining whether an officer objectively used reasonable force, the Tenth Circuit in recent years has shut that door.  the Tenth Circuit has done so under rule 401.  Thus, a witness giving an opinion about the use of force must be careful to do so under rule 701 and not under 702.

### 1.    Tanberg v. Sholtis.

The Tenth Circuit has indicated in recent opinions that, in the 42 U.S.C. § 1983 context, the jury cannot use law enforcement policies and standards to inform the debate  whether a civil rights violation has occurred.  "That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant."  Tanberg v. Sholtis, 401 F.3d 1151, 1163-64 (2005).  "If [the officer] violated the [standard operating procedure] governing the use of force in effecting arrest . . . [that] is not relevant to determining if Plaintiff's arrest violated the [objective] reasonableness requirement of the Fourth Amendment."  Id. at 1164.  See Marquez v. City of Albuquerque, 399 F.3d 1216, 1222 (10th Cir. 2005)(stating that "the Fourth Amendment does not require [police] to use the least intrusive means in the course of detention, only reasonable ones," and that "violations of . . . police procedure generally do not give rise to a 1983 claim for excessive force")(internal citations and quotations omitted); Chamberlin v. City of Albuquerque, No. 02-0603, 2005 WL 2313527 (D.N.M. 2005)(Browning, J.)(holding that, based on Tanberg v. Sholtis and Marquez v. City of Albuquerque,

the plaintiff could not introduce into evidence standard operating procedures to support his allegation that a police officer used force unreasonably in violation of his Fourth Amendment rights).  While no Tenth Circuit case specifically addresses this issue in the criminal context, the Court does not believe that there is a reasonable distinction that would allow law enforcement policies and standards to be admitted in criminal but not civil matters.  Moreover, case law suggests that no distinction concerning precedent should be made between cases involving § 1983 and 18 U.S.C. § 242 -- the statute pursuant to which the underlying conduct in this case has been charged  See United States v. Perkins, 470 F.3d 150, 159 (2006)("Because 18 U.S.C. § 242 is merely the criminal analog of 42 U.S.C. § 1983, and because Congress intended both statutes to apply similarly in similar situations, our civil precedents are equally persuasive in this criminal context.")(internal citations and quotations omitted).  Further, given the heightened liberty interests and evidentiary standards existing in the criminal context, the Court believes that a broad reading of the Tenth Circuit's decisions concerning the use of policies and standards is advisable.  There does not appear to be a good reason to not use policies against a police officer in a civil case but allow them to be used against the same police officer in a criminal trial.

## 2.      **Rule 401.**

Rule 401 of the Federal Rules of Evidence provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  While it would seem that whether officers acted in accordance with departmental policies and standards could be relevant in excessive use of force cases, the Tenth Circuit appears to have foreclosed district courts from making that conclusion.  Accordingly, the Court will exclude such

testimony.

The Court notes that the United States has cited <u>United States v. Perkins</u> for the proposition that departmental policies and standards can indeed be introduced to help the jury assess reasonableness in 18 U.S.C. § 242 contexts.  Because <u>United States v. Perkins</u> is a United States Court of Appeals for the Fourth Circuit case, it is not controlling precedent.  In <u>United States v. Perkins</u>, the Fourth Circuit determined that the United States' questions to officers at trial whether, based on their experience and assessment of the situation, there was any law enforcement reason for the officer on trial to kick a subdued suspect, and the officers' responses that there was not, were admissible.  <u>See</u> 470 F.3d at 153, 156, 159-60.  The Fourth Circuit, without discussing relevance, held:

> Both officers observed [the defendant officer] kick [the subdued suspect] and thus testified based on their contemporaneous perceptions; as such, their testimony satisfies Rule 701's personal knowledge requirement.  <u>See</u> Fed. R. Evid. 701. Moreover, their observations were "common enough and require[d] such a limited amount of expertise . . . that they can, indeed, be deemed lay witness opinion[s]." <u>United States v. VonWillie</u>, 59 F.3d 922, 929 (9th Cir.1995).  Because their testimony was framed in terms of their eyewitness observations and particularized experience as police officers, we have no trouble finding that their opinions were admissible under Rule 701.
>
> * * * *
>
> The officers' responses that they personally saw no reason for [the defendant officer's] kicks provided the jury with concrete examples against which to consider the more abstract question of whether an "objectively reasonable officer" would have employed the same force.  The Government's questions were not couched in terms of objective reasonableness; instead, they honed in on [the witness officers'] personal assessments of [the defendant officer's] use of force.  We recognize that this distinction is a fine one.  When the common and legal meanings of a term are not easily unfurled from each other, however, as is certainly the case with "reasonable," it is difficult for us to conclude that testimony was unhelpful to the jury unless the testimony actually framed the term in its traditional legal context.  In this case, then, Rule 704 justifies differentiating between the officers' testimony that they saw no

"law enforcement" or "legitimate" reason for [the defendant officer's] kicks and testimony that [the defendant officer's] actions were "objectively unreasonable."

Id. at 156-159.

The Court believes that the Tenth Circuit's rulings and the Fourth Circuit's holding in United States v. Perkins are distinguishable.  From the portions of the record available to the Court from the United States v. Perkins opinion, it appears that the United States did not seek to introduce specific law enforcement policies and standards at trial, and did not seek to introduce testimony regarding whether the defendant officer's actions violated law enforcement policies and standards.  See 470 F.3d at 153-54.  In contrast, in Tanberg v. Sholtis the Tenth Circuit addressed whether the plaintiff could introduce actual portions of standard operating procedures, solicit expert opinion whether the defendant officer's actions conformed to those standards, and proffer evidence that the defendant officer's department's investigation of his actions had concluded that he had violated their standards. See 401 F.3d at 1162.  The Court does not believe that Tanberg v. Sholtis may prohibit all of the constrained testimony it appears was offered in United States v. Perkins.  Nor, however, does United States v. Perkins alter the Court's determination that the United States cannot introduce law enforcement policies and standards, or opinions concerning their violation to inform the jury at trial.

### 3.    Rule 701.

Rule 701 of the Federal Rules of Evidence states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  Rule 701 thus permits the admission of lay opinion testimony provided that it has

a rational basis in perception and is helpful.  See United States v. Bush, 405 F.3d 909, 915-16 (10th

Cir. 2005).  "The perception requirement stems from [rule] 602 [of the Federal Rules of Evidence,]

which requires a lay witness to have first-hand knowledge of the events he is testifying about so as

to present only the most accurate information to the finder of fact."  Id. at 916 (internal quotations

and citations omitted); Fed. R. Evid. 602.

> [W]hile lay opinion testimony must be based on personal knowledge, see Fed. R.
> Evid. 701, "expert opinions may [also] be based on firsthand observation and
> experience."  29 Charles Wright & Victor Gold, Federal Practice and Procedure:
> Evidence § 6253 (1997 & Supp. 2006).  At bottom, then, Rule 701 forbids the
> admission of expert testimony dressed in lay witness clothing, but it "does not
> interdict all inference drawing by lay witnesses."  United States v. Santos, 201 F.3d
> 953, 963 (7th Cir. 2000).

United States v. Perkins, 470 F.3d at 155-56 (emphasis in original).

### 4.    Rule 703.

Rule 703 of the Federal Rules of Evidence provides:

> The facts or data in the particular case upon which an expert bases an opinion or
> inference may be those perceived by or made known to the expert at or before the
> hearing.  If of a type reasonably relied upon by experts in the particular field in
> forming opinions or inferences upon the subject, the facts or data need not be
> admissible in evidence in order for the opinion or inference to be admitted.  Facts or
> data that are otherwise inadmissible shall not be disclosed to the jury by the
> proponent of the opinion or inference unless the court determines that their probative
> value in assisting the jury to evaluate the expert's opinion substantially outweighs
> their prejudicial effect.

Fed. R. Evid. 703.  Under the standard that the Supreme Court established in Daubert v. Merrell

Dow Pharm., Inc., 509 U.S. 579 (1993), "[p]roposed testimony must be supported by appropriate

validation -- i.e., 'good grounds.'"  Id. at 590.  Accordingly, the requirements of Dauber v. Merrill

Dow Pharm., Inc. assign trial judges a gatekeeper function that "entails a preliminary assessment of

whether the reasoning or methodology underlying the testimony is scientifically valid and . . .

whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93.
Dauber v. Merrill Dow Pharm., Inc., however, applies only to the qualifications of an expert and the
methodology or reasoning used to render an expert opinion; it generally does not regulate the
underlying facts or data on which an expert relies when forming his or her opinion.  See United
States v. Lauder, 409 F.3d 1254, 1264 (10th Cir. 2005).

> ### 5.   **Rule 704.**

Rule 704 of the Federal Rules of Evidence states:

> (a) Except as provided in subdivision (b), testimony in the form of an opinion or
> inference otherwise admissible is not objectionable because it embraces an ultimate
> issue to be decided by the trier of fact.

> (b) No expert witness testifying with respect to the mental state or condition of a
> defendant in a criminal case may state an opinion or inference as to whether the
> defendant did or did not have the mental state or condition constituting an element
> of the crime charged or of a defense thereto.  Such ultimate issues are matters for the
> trier of fact alone.

Fed. R. Evid. 704.  Rule 704 was amended in 1984, see Pub.L. 98-473, adding subdivision (b) and
reflecting the addition of that subdivision in subdivision (a), see id.  Rule 704 prohibits an expert
from expressly stating the final conclusion or inference as to a defendant's mental state; it does not
prevent an expert from testifying to facts or opinions from which the jury could conclude or infer
that the defendant had the requisite mental state.  See United States v. Torres, 53 F.3d 1129, 1141-42
(10th Cir. 1995).

"[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under
rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-
helpers of an earlier day."  United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002).  Pursuant
to rule 704, it is the task of the courts "to distinguish [helpful] opinion testimony that embraces an

ultimate fact from [unhelpful] opinion testimony that states a legal conclusion." United States v. Perkins, 470 F.3d at 158 (internal citations and quotations omitted).  In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning.  See id.

In United States v. Perkins, the Fourth Circuit stated that "objective reasonableness" was the applicable standard upon which the jury should evaluate the defendant officer's use of force, noted that at trial the government asked its expert whether there was "any legitimate reason" for the defendant officer to kick the subdued suspect, and concluded that rule 704 was not violated because:

> While a very close question, we conclude that the Government's questions were phrased in such a manner so as to avoid the baseline legal conclusion of reasonableness. . . .  The [expert's] responses that [he] personally saw no reason for [the defendant officer's] kicks provided the jury with [a] concrete example [] against which to consider the more abstract question of whether an "objectively reasonable officer" would have employed the same force.  The Government's questions were not couched in terms of objective reasonableness; instead, they honed in on [the expert's] personal assessments of [the defendant officer's] use of force.  We recognize that this distinction is a fine one.

470 F.3d at 159.

## ANALYSIS

While there are limits on what Chamberlain can say, she can testify about what she observed and did.  Chamberlain and the Court must be careful, however, to ensure that the CCDC's policies and standards are not invoked to show that Mr. Gould violated Barber's civil rights.  To that end, the Court will not allow Chamberlain to testify about the CCDC's policies and standards except insofar as they are introduced for the limited purpose of demonstrating that Mr. and Ms. Gould had knowledge of some of them and that Ms. Gould was untruthful to State Police investigators about her knowledge of the circumstances surrounding the alleged incident involving Barber.

I.    **SOME OF CHAMBERLAIN'S ANTICIPATED TESTIMONY ABOUT MR. GOULD'S USE OF FORCE, THE FN303, AND PEPPER SPRAY IS ADMISSIBLE.**

While much of Chamberlain's testimony will be about what she observed and thus admissible, she will need to be careful in other areas.  The United States, as the proponent of her testimony, has not shown that she is an expert in the use of force.  On the other hand, her training may be relevant to showing Ms. Gould received and thus whether some of her statements to the State Police were willfully false.

A.    **CHAMBERLAIN'S ANTICIPATED TESTIMONY ABOUT POLICIES GOVERNING USE OF FORCE IS NOT, AS A MATTER OF LAW, RELEVANT.**

Pursuant to applicable Tenth Circuit authority, Chamberlain's testimony about the CCDC's use of force policies and standards is not relevant for the purpose of showing that Mr. Gould violated Barber's civil rights.  See Tanberg v. Sholtis, 401 F.3d at 1164 ("If [the officer] violated the [standard operating procedure] governing the use of force in effecting arrest . . . [that] is not relevant to determining if Plaintiff's arrest violated the [objective] reasonableness requirement of the Fourth Amendment.").  Accordingly, the United States cannot use the training the CCDC's employees received to deal with unruly inmates to demonstrate that Mr. Gould violated Barber's civil rights.  Nor can the United States use Chamberlain's training to aid in establishing a lack of legitimate purpose behind Mr. Gould's use of the FN303.

The circumstances surrounding Mr. Gould's use of the FN303 bears on whether he unnecessarily inflicted pain on Barber.  See Hudson v. McMillian, 503 U.S. 1, 5 (1992)(holding that the Eighth Amendment forbids the unnecessary and wanton infliction of pain); Green v. Branson, 108 F.3d 1296, 1300-1301 (10th Cir. 1997)("[T]he question whether the measure taken inflicted

unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."). Nevertheless, the Court does not believe that testimony by Chamberlain that training at the CCDC ensured that the policy that only that amount of force necessary to manage the risk posed should be used -- and no more -- when dealing with inmates was well known will aid in establishing that Mr. Gould acted willfully. The Tenth Circuit has indicated that is not a proper purpose of policies and standard-operating procedures in civil rights cases. See Tanberg v. Sholtis, 401 F.3d at 1164.

Nevertheless, Chamberlain's testimony may provide evidence supporting the charge against Ms. Gould by proving that she lied to New Mexico State Police investigators when she stated that Mr. Gould fired the FN303 because a full extraction team was unavailable and that she was not familiar with the weapons in use at the facility. If there are specific items in Chamberlain's training that implicate the truthfulness of what Ms. Gould told the State Police, the United States will be offering Chamberlain principally as a fact witness to describe the training that she and others, including Ms. Gould, received at the CCDC regarding the use of weapons. The Court believes that such testimony is admissible under rules 401 and 701. The Court will thus not preclude all testimony concerning training, but will probably need to take objections one question at a time at trial.

**B.     CHAMBERLAIN IS NOT AN EXPERT ON PEPPER SPRAY OR THE FN303.**

Ms. Gould contends that Chamberlain's anticipated testimony about pepper spray and the FN303 is inadmissible because Chamberlain is not an expert in the use of, characteristics of, or any

other aspect of pepper spray or the FN303.  Ms. Gould argues that Chamberlain's minimal training

at the detention center does not qualify her to testify as an expert.  The Court agrees.  Rule 702 and

Dauber  preclude Chamberlain from testifying as an expert about pepper spray and the FN303, but

pursuant to rule 701, she may testify about what she knew about those weapons to help establish

what Ms. Gould knew about them.  Ms. Gould is entitled to a limiting instruction that the statements

are not to be used for the truth of the matters asserted, but only to determine what Ms. Gould knew

about the weapons.

Accordingly, the Court will not allow the following statements by Chamberlain into evidence

at trial: (i) opinions about the FN303, including when it should be used, how it should be used, the

accuracy of the FN303, how many rounds are required to subdue an inmate, and/or whether it was

appropriate for Mr. Gould to use it against Barber; (ii) opinions about the use of pepper spray,

including a comparison of pepper spray to the FN303; and (iii) hearsay statements of Joseph Garcia

regarding pepper spray and the FN303.  She may, however, testify about her training if the United

States shows such training is relevant to Ms. Gould's training and thus to her statements to the State

Police.  Again, Gould is entitled to a limiting instruction.

The testimony Chamberlain will be allowed to present will be largely a factual narrative of

what she saw, what she and others did, and what was not done.  It would be inappropriate to exclude

Chamberlain's testimony about her observations of the use of pepper spray and the FN303.  See Fed.

R. Evid. 401, 701.  The United States is not offering her as an expert in these areas.  Accordingly,

Chamberlain can testify about the details of what she observed.

In addition, Chamberlain is in a unique position to offer a lay opinion concerning Barber's

opportunity to comply with Mr. Gould's commands.  See Fed. R. Evid. 701.  Chamberlain was

present immediately before, during, and after Mr. Gould shot at Barber.  The Court believes that her

testimony regarding the shooting will satisfy rule 701.  It  will be based on her actual perceptions,

not on any technical or scientific expertise, and will be helpful to the jury in developing an

understanding of several facts in issue.  Chamberlain, therefore, can testify about Barber's

opportunity to comply with Mr. Gould's commands.

### C.    CHAMBERLAIN MAY NOT TESTIFY THAT MR. GOULD WAS UNJUSTIFIED IN USING THE FN303 TO ADDRESS BARBER'S SITUATION.

The Court believes that the Fourth Circuit's line in United States v. Perkins is not the

appropriate one in this case.  The Court will not only not allow Chamberlain or other officer

witnesses to say that Mr. Gould's actions were "objectively unreasonable," but also will not allow

them to say that they saw no "law enforcement" or "legitimate" reason for Mr. Gould's actions.  The

Court also  will not allow Chamberlain to offer her opinions about whether Mr. Gould's actions were

"justified."   In addition, Chamberlain may not testify that, based upon specific elements of her

training, policies, or standards at the CCDC, and the circumstances she observed, there was no

reason for Mr. Gould to use the FN303.  See Hudson v. McMillian, 503 U.S. at 6-7 (stating that

determining whether force was used in a good faith effort to maintain order involves balancing the

need for force with the amount of force used); Despain v. Uphof, 264 F.3d 965, 978 (10th Cir.

2001)(asserting that, where no legitimate penological purpose can be inferred from a prison

employee's use of force, the conduct constitutes evidence that force was used maliciously and

sadistically for the purpose of causing harm).  The Court believes that the Tenth Circuit's ruling in

Tanberg v. Sholtis may preclude such testimony.

The Court also believes, however, that Chamberlain can offer lay opinions whether Mr.

-17-

Gould's actions were "necessary," and that Chamberlain can discuss, based upon her experience generally and the scene before her, but without reference to specific training, policies, or standards, whether there was reason for Gould's actions.  See United States v. Perkins, 470 F.3d at 156 ("Because their testimony was framed in terms of their eyewitness observations and particularized experience as police officers, we have no trouble finding that their opinions were admissible under Rule 701.").  The Court agrees with the Fourth Circuit that these are fine lines, but believes that the line this Court has drawn preserves the concerns of Tanberg v. Sholtis, yet allows Chamberlain and other eyewitnesses to testify about what they saw.  If a UPS delivery man had shown up at the time and place of the shooting, rule 701 would allow him to testify about what he saw and whether he thought the shooting was necessary; Mr. and Ms. Gould could cross-examine him as being untrained and ignorant.  There is no reason to prevent Chamberlain from testifying about what she saw and her simple lay opinion, even though she has some training in the field.

## II.     CHAMBERLAIN'S ANTICIPATED TESTIMONY ABOUT BARBER'S MEDICAL CARE IS ADMISSIBLE.

On the record before the Court pretrial, it would appear that Chamberlain's anticipated testimony about Barber's medical care is relevant.  She also appears qualified to give the anticipated testimony.  While the Court cannot, on the record before the Court, yet rule whether her testimony in this area is admissible, the Court will not allow her to speculate about factual issues.

### A.     CHAMBERLAIN'S TESTIMONY ABOUT MEDICAL CARE IS RELEVANT.

Ms. Gould contends that Chamberlain's opinion and speculation about the medical treatment Barber received after he was shot with the FN303 are inadmissible because they are not relevant to

the witness tampering charge against her.  Additionally, Ms. Gould contends that Chamberlain's

opinions are far more prejudicial than probative.

The Court finds Ms. Gould's argument unpersuasive.  Count Five alleges that Ms. Gould

intentionally made misleading statements to State Police concerning the use of force against Barber

and his subsequent medical care.  See Indictment at 4-5.  Rather than being irrelevant, Chamberlain's

testimony about Mr. Gould's allegedly unlawful use of force, the nature of Barber's injuries, and

Barber's medical treatment goes to Ms. Gould's motivation to mislead the State Police.  The Court

believes that such testimony would help provide the jury with an understanding of important facts

in issue and satisfies rules 401, 403, and 701.  The Court will thus allow Chamberlain to testify at

trial concerning Mr. Gould's use of force and the nature and scope of Barber's injuries and treatment.

### B.    CHAMBERLAIN IS QUALIFIED TO TESTIFY ABOUT BARBER'S WOUNDS.

Ms. Gould seeks to exclude Chamberlain's testimony about the source of Barber's wounds,

her concerns about infection of his wounds, whether outside medical should have been sought, the

nature and adequacy of the care provided to Barber at the CCDC, and whether Barber had an

opportunity to comply with Mr. Gould's commands before he was shot with the FN303.  Ms. Gould

contends that Chamberlain's various medical opinions are inadmissible because she is not an expert

in medicine; Ms. Gould argues that Chamberlain is not qualified to testify to the jury about her

medical opinions.

The Court finds that Chamberlain is qualified, either pursuant to rule 701 or 702, to testify

on each of these topics.  Her testimony would necessarily rely on her specific training at the CCDC

and her training to be a medical technician.  While Chamberlain needs some general expertise in

medicine to provide some of those opinions, none of these topics require Chamberlain to be qualified as an expert in emergency medicine. Moreover, with respect to testimony regarding having faced circumstances involving Barber that were beyond her training and that required the application of specialized knowledge beyond her specialized training, the Court believes that Chamberlain, based on her training and experience, is qualified to offer such opinions.

The Court will therefore allow Chamberlain to opine: (i) about the etiology of the wounds appearing on Barber's body on March 31, 2002; (ii) whether bacteria had infected the wounds; (iii) whether outside medical assistance should have been sought; (iv) about the medical adequacy and medical appropriateness of the treatment Barber received; (v) about the treatment Barber received when Chamberlain was not at work or when she was treating other inmates in other locations within the detention center; (vi) about the nature or extent of treatment Ms. Gould administered to Barber when Chamberlain was not at work or when she was treating other inmates in other locations within the detention center; and (vii) about Barber's opportunity to comply with John Gould's commands before the use of the FN303. With the exception of the last opinion, which rule 701 covers, the Court concludes that all of these opinions are subject to rule 703. While the Court cannot rule at this time that all such opinions are admissible with the record before it, the Court concludes that Chamberlain is qualified to give all of the opinions.

While couched in an objection to Chamberlain offering a variety of expert opinions, Ms. Gould also objects that Chamberlain would testify that neither she, nor her fellow medical technicians, were qualified to treat serious wounds without the consultation of a doctor. Because of her training, Chamberlain should be able to testify whether other medical technicians were qualified to treat wounds without the consultation of a doctor; she probably makes that determination

-20-

daily, not just in court.  In any event, she certainly may testify regarding whether she was qualified.

### C.   CHAMBERLAIN WILL NOT BE ALLOWED TO SPECULATE.

Ms. Gould argues that Chamberlain's opinion concerning what Barber's skin might have looked like if he had been photographed at another time is inadmissible because it is speculation and because Chamberlain is not qualified as a medical expert.  The Court agrees to the extent that is what Chamberlain is doing.  Chamberlain cannot speculate what Barber's body might have looked like days earlier.  If, however, Chamberlain saw Barber's skin earlier and can say that the later photograph is not representative, the Court will allow her to do so.

The improper use of force, the failure to provide proper care, and the nature of Barber's injuries are important to Ms. Gould's motive for misleading the State Police.  Because evidence on these issues tends to make the existence of Ms. Gould's motive to obstruct the investigation more probable, the testimony is relevant to the charge against Ms. Gould in Count 5.

**IT IS ORDERED** that Defendant Violet Gould's Motion in Limine Regarding Statements of Kristi Chamberlain is granted in part and denied in part.  Chamberlain may not testify as an expert about pepper spray and the FN303; she may, however, testify about what she knew about those weapons for the purpose of establishing what Ms. Gould knew about them.  The United States cannot introduce statements by Chamberlain regarding (i) opinions about the FN303, including when it should be used, how it should be used, the accuracy of the FN303, how many rounds are required to subdue an inmate, and/or whether it was appropriate for Mr. Gould to use it against Barber; (ii) opinions about the use of pepper spray, including a comparison of pepper spray to the FN303; and (iii) hearsay statements of Joseph Garcia regarding pepper spray and the FN303.  Chamberlain can testify about the details of what she observed with regard to Mr. Gould's use of the FN303.

Chamberlain can offer a lay opinion concerning Barber's opportunity to comply with Mr. Gould's commands.  Chamberlain cannot offer opinions about whether Mr. Gould's actions were "justified" or whether, based upon specific elements of her training, policies, or standards, and the circumstances she observed, there was no reason for Mr. Gould to use the FN303.  Chamberlain can, however, offer opinions about whether Mr. Gould's actions were "necessary," and can discuss, based upon her experience generally and the scene before her, but without reference to specific training, policies, or standards, whether there was any reason she could see for Gould's actions.  Chamberlain is qualified  to offer opinions regarding: (i) the etiology of the wounds appearing on Barber's body on March 31, 2002; (ii) whether bacteria had infected the wounds; (iii) whether outside medical assistance should have been sought; (iv) the medical adequacy and medical appropriateness of the treatment Barber received; (v) the treatment Barber received when Chamberlain was not at work or when she was treating other inmates in other locations within the detention center; (vi) the nature or extent of treatment Ms. Gould administered to Barber when Chamberlain was not at work or when she was treating other inmates in other locations within the detention center; and (vii) Barber's opportunity to comply with John Gould's commands before the use of the FN303.  Chamberlain cannot speculate about what Barber's body might have looked like days before the photograph at issue, but, if, she saw Barber's skin earlier and can say that the later photograph is not representative, she may do so.

_____
UNITED STATES DISTRICT JUDGE

-22-

*Counsel*:

Larry Gomez
   Acting United States Attorney
J. Miles Hanisee
   Assistant United States Attorney
Albuquerque, New Mexico

-- and --

Mark Blumberg
J. Evans Rice III
   Trial Attorneys
Civil Rights Division, Criminal Section
United States Department of Justice
Washington, D.C.

     *Attorneys for the Plaintiff*

Steven Aarons
Santa Fe, New Mexico

     *Attorney for Defendant John Gould*

Scott M. Davidson
Albuquerque, New Mexico

-- and --

Michael V. Davis
Santa Fe, New Mexico

     *Attorneys for Defendant Violet Gould*